UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LILLIAN ELLIOT, on behalf of herself and others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CONAGRA BRANDS, INC.,<br><br>Defendants. | No. 2:23-cv-01417-DJC-AC<br><br>**ORDER** |

  Plaintiff Lillian Elliot regularly used Defendant Conagra Brands, Inc.'s ("Conagra") butter substitute product sold under the brand name Smart Balance. Plaintiff alleges that Defendant altered the ingredient ratios of its product – Smart Balance Original spread – thereby reducing its quality, without adequately notifying consumers. After Plaintiff's original complaint was dismissed with leave to amend by Judge Morrison C. England, she refiled a First Amended Complaint (ECF No. 41, hereinafter "FAC"), advancing similar arguments. For the reasons discussed below, the Court finds that Plaintiff has not adequately overcome the concerns originally identified by Judge England, and that the newly raised allegations are unpersuasive or Plaintiff lacks standing to bring them. The Court dismisses Plaintiff's case with leave to amend.

1

**BACKGROUND**

Defendant manufactures a line of butter-substitute, vegetable-oil-based products, including "Smart Balance Original" spreads. (FAC ¶¶ 18, 21.) Historically, Defendant has manufactured Smart Balance Original with a composition of 64% vegetable oil and 32% water. (*Id.* ¶ 23.) But, during a two-month period in 2022, Defendant altered the composition to be approximately 39% oil and 57% water. (*See id.* ¶¶ 33, 35.) Plaintiff is a consumer who purchased Defendant's Smart Balance Original spread before and during the period where its composition changed to include more water and less oil. (*Id.* ¶ 16.) Replacing oil with water leads to a lower-quality product, and consumers reported that the composition with added water was more difficult to spread on toast, could not be used effectively for frying or sautéing, and ruined baked goods when used as a butter substitute. (*Id.* ¶¶ 97–109.) Despite the change in ingredients, the new Smart Balance Original spread was still sold at the same price as the original recipe. (*Id.* ¶ 84.) Although the packaging of the Smart Balance Original spread was changed to identify the adjusted ratios of oil and water, the text was small, difficult to read, and could be obstructed by stacking the spread containers on top of each other. (*Id.* ¶¶ 41, 43-47, 88.) Plaintiff also alleges that the Smart Balance Original spread, while marketed as containing 320 or 400 mg of Omega 3 per serving, only provided 45 to 60 mg of Omega 3 that is physiologically available for absorption into the body. (*Id.* ¶ 265.) This is because the type of Omega 3 used by Defendant – alpha linolenic acid – is less absorbable than other forms of Omega 3. (*Id.* ¶ 260.)

Plaintiff contends that Defendant "initiated a campaign of consumer deception" by selling the lesser-quality composition with increased water, while maintaining nearly identical packaging. (*Id.* ¶ 25.) She filed a complaint against Defendant in 2023, which was dismissed in 2024 by Judge England with leave to amend. (ECF Nos. 1, 39.) In his order dismissing the original complaint, Judge England noted that "[t]he crux of Plaintiff's argument is essentially that she did not read the label." (ECF No. 39

at 7.) Plaintiff brings substantially similar claims here, on behalf of herself and all others similarly situated, specifically alleging the following causes of actions:

1. Violation of the Consumer Legal Remedies Act (Cal. Civ. Code §§ 17500, et seq.), arguing that replacing the oil with water while failing to appropriately update the labeling is an unfair, deceptive, unlawful, or unconscionable commercial practice (FAC ¶¶ 308–19);
2. Violation of the Unfair Competition Law (Cal. Bus. & Prof. Code §§ 17200, et seq.), arguing that replacing the oil with water while failing to appropriately update the labeling is an unfair, deceptive, unlawful, or unconscionable commercial practice (FAC ¶¶ 320–52);
3. Violation of the False Advertising Law (Cal. Bus. & Prof. Code §§ 17500, et seq.), arguing that the difficult-to-read label did not adequately advise consumers of the oil and water content, and that the label mislead consumers into thinking the new composition could be used for cooking purposes (FAC ¶¶ 353–64);
4. Breach of Express Warranties (Cal. Comm. Code § 2313 & common law), arguing that the label did not adequately inform consumers that the oil and water composition had changed, and that the new composition was not proper for cooking or baking yet was advertised as being so (FAC ¶¶ 365–78);
5. Breach of Implied Warranties (Cal. Comm. Code § 2314 & common law), arguing that the label did not adequately inform consumers that the oil and water composition had changed, and that the new composition was not proper for cooking or baking yet was advertised as being so (FAC ¶¶ 379–401);
6. Negligent Misrepresentation (Cal. Civ. Code §§ 1709–1710), arguing that the new composition was not suitable for cooking or baking yet was advertised as being so (FAC ¶¶ 402–25);

3

7. Breach of Contract, arguing that Defendant failed its contractual duties by supplying an inferior product (FAC ¶¶ 426–41);

8. Breach of Duty of Good Faith and Fair Dealing, arguing that Defendant failed its contractual duties by supplying an inferior product (FAC ¶¶ 442–54);

9. Fraudulent Inducement, arguing that the label misrepresented the actual levels of oil and water in the revised product (FAC ¶¶ 455–62); and

10. Negligence, arguing that Defendant knew or should have known that the product was not usable for cooking or baking and that its use was potentially dangerous (FAC ¶¶ 463–79).

Defendant moves to dismiss each of Plaintiff's causes of action. (ECF No. 53, hereinafter "Mot.")

## LEGAL STANDARD

A party may move to dismiss for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). The motion may be granted only if the complaint lacks a "cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). While the Court assumes all factual allegations are true and construes "them in the light most favorable to the nonmoving party," *Steinle v. City & Cnty. of S.F.*, 919 F.3d 1154, 1160 (9th Cir. 2019) (internal quotations omitted), if the complaint's allegations do not "plausibly give rise to an entitlement to relief," the motion must be granted, *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). However, if the "plaintiffs . . . have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

A complaint need contain only a "short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), not "detailed factual allegations," *Twombly*, 550 U.S. at 555. However, this rule demands more than unadorned accusations; "sufficient factual matter" must make the claim at least

plausible. *Iqbal*, 556 U.S. at 678. In the same vein, conclusory or formulaic recitations of elements do not alone suffice. *Id.* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* This evaluation of plausibility is a context-specific task drawing on "judicial experience and common sense." *Id.* at 679.

## DISCUSSION

Undergirding all of Plaintiff's claims is whether her confusion about the Smart Balance Original spread is aligned with that of a reasonable consumer. In assessing this point, the Court must address: (1) whether the Smart Balance Original spread's packaging would have misled a reasonable consumer as to the amount of oil, water, and Omega 3 in the product; (2) whether the Smart Balance Original spread's packaging would have mislead a reasonable consumer as to whether the product was "great" for cooking or baking purposes; (3) whether Defendant's alteration of the product's composition to use more water and less oil was economic adulteration; and (4) whether the product's classification as a "buttery spread" necessitated a front-label advisement that the product contains artificial flavors.

### A. A Reasonable Consumer Would Not Be Misled by the Product Packaging Because That Packaging Explicitly Lists the Quantity of Oil, Water, and Omega 3 in the Product

Plaintiff asserts that a reasonable consumer, after reading Smart Balance Original spread's label, would be misled as to its content of oil, water, and Omega 3, in part because the change in the product's ingredient ratios was not advertised. (FAC ¶¶ 85–110.) Defendant counters that the label informs the consumer of the exact quantities of the products ingredients. (Mot. at 7–10.)

California consumer protection claims are assessed under a reasonable consumer standard. *Williams v. Gerber Products Co.*, 552 F.3d 934, 938 (9th Cir. 2008); *Lavie v. Proctor & Gamble Co.*, 105 Cal. App. 4th 496, 506–07 (2003). Under the reasonable consumer standard, a plaintiff must show that members of the public

5

1 are likely to be deceived by Defendant's actions. *Freeman v. Time, Inc.*, 68 F.3d 285,
2 289 (9th Cir. 1995). The public can be deceived by advertising that is false or
3 misleading. *Kasky v. Nike, Inc.*, 27 Cal. 4th 939, 951 (2002).

4 Here, as originally decided by Judge England, Plaintiff cannot show that she
5 was deceived by the Smart Balance Original spread's labeling. That is because the
6 labeling was neither false in its description of the ingredients nor was it misleading: it
7 told the consumer exactly what the oil, water, and Omega 3 content in the product
8 was. Plaintiff seeks to get around this conclusion in three ways.

9 First, Plaintiff argues that the actual design of the container made it difficult to
10 see the text on the label that lists the ingredient percentages. (FAC ¶¶ 40–45.) While
11 Plaintiff's observation may be true that the product, when stacked, made it difficult to
12 see the label's text listing the percentages of oil and water in the product is, it is
13 ultimately unavailing. This is because the consumer can still pick up the product and
14 read the label, after which they would learn the accurate amount of water, oil, and
15 Omega 3 the product contains. Indeed, Judge England rejected Plaintiff's exact
16 argument in his Order on the original Complaint. (ECF No. 39 at 6.)

17 Second, she argues that a reasonable consumer, even if they did see the label
18 that lists the ingredient percentages, would not be familiar with the original amount of
19 oil and water in the product and thus would not be able to identify that those
20 percentages had changed. (FAC ¶¶ 85–96.) But the test is not whether a consumer
21 will know the ingredients have changed, it is whether, after reading a product's label,
22 a consumer will know the ingredients in that product. The straightforward application
23 of common sense makes it difficult to reach the conclusion that after reading the label,
24 which explicitly states the amount of oil, water, and Omega 3 in the product, a
25 consumer would not know that the product contained exactly those ingredients in
26 exactly those quantities. *See Gitson v. Trader Joe's Co.*, No. 13-CV-01333-WHO, 2013
27 WL 5513711, *7 (N.D. Cal. Oct. 4, 2013) ("[D]ismissal is appropriate where 'the
28 advertisement itself made it impossible for the plaintiff to prove that a reasonable

6

consumer was likely to be deceived.'") (quoting *Williams*, 552 F.3d at 939).).  Plaintiff does not identify caselaw, nor is the Court aware of any, that requires a manufacturer to proactively advise consumers via its label that the ingredients in the product have changed.

The label in this case told the consumer in no uncertain terms exactly what was in the product: 39% oil, 57% water, and either 320 or 400 mg of Omega 3.  A reasonable consumer cannot be misled by the label into thinking that there was more oil or Omega 3 in the product because the label told the consumer the precise measurement of oil and Omega 3 content.  *See Cheslow v. Ghirardelli Chocolate Co.*, 445 F. Supp. 3d 8, 20 (N.D. Cal. 2020) ("[W]here the actual ingredients are disclosed, a plaintiff may not ignore the ingredient list.").

Third, Plaintiff argues that the Omega 3 content descriptor on the label was misleading to consumers because the actual amount of absorbable Omega 3 from the product was less than the listed amount.  (FAC ¶¶ 254–78.)  Plaintiff does not contest that the amount of Omega 3 advertised on the label was accurate.  (*See id.* ¶¶ 265–66.)  Instead, her argument is that the type of Omega 3 used by Defendant is inferior to other types that would provide increased amounts of Omega 3 fatty acids that can be absorbed upon consumption.  (*Id.*)  But Defendant has not made any sort of claim or statement about how much Omega 3 fatty acids a consumer would absorb from eating the product.  Just like the oil and water content, the label listed the exact amount of Omega 3 in the product and would therefore not mislead a reasonable consumer.  *See Gitson*, 2013 WL 5513711, at *7.

Plaintiff relies on comments submitted by "[t]housands of reasonable ordinary consumers reported in writing" to demonstrate consumer confusion and dissatisfaction over Defendant's implementation of the recipe with increased water and reduced oil.  (FAC ¶¶ 35, 55, 59, 80, 85, 105, 122.)  While the magnitude of the comments submitted is noteworthy, it cannot overcome the fact that the label of the product, as noted above, explicitly informed those consumers of the oil, water, and

Omega 3 content of the product they were purchasing.

For these reasons, the Court again concludes that the product's label could not be misleading to a reasonable consumer.

**B.    Defendant's Marketing of Smart Balance Original Spread as "Great" For Cooking or Baking Was Nonactionable Puffery.**

Plaintiff avers that Defendant's labelling of the product as "great" for cooking or baking amounts to more than nonactionable puffery because it rendered the product unusable for its marketed purpose. (*Id.* ¶¶ 97–136.) In rebuttal, Defendant argues that the label's advertising amounts to puffery, meaning it would not be relied on by the consumer. (Mot. at 11–13.)

"Generalized, vague, and unspecific assertions" upon which a reasonable consumer could not rely are considered to be nonactionable "puffery." *Glen Holly Ent. Inc. v. Tektronix Inc.*, 352 F.3d 367, 379 (9th Cir. 2003). "The common theme that seems to run through cases considering puffery . . . is that consumer reliance will be induced by *specific* rather than *general* assertions." *Cook, Perkiss and Liehe, Inc. v. N. Cal. Collection Serv. Inc.*, 911 F.2d 242, 246 (9th Cir. 1990) (emphasis added). "[A]dvertising which merely states in general terms that one product is superior is not actionable." *Id.*, quoting *Smith-Victor Corp. v. Sylvania Elec. Prod., Inc.*, 242 F. Supp. 302 (N.D. Ill. 1965).

This precise claim was previously rejected by Judge England. (ECF No. 39 at 9–10.) Plaintiff alleges that the Smart Balance Original spread's label that advertised the product as "great" for cooking or baking was "false." (*See* FAC ¶ 114–117.) But the word "great" is subjective, not objective. And the label's description was plausibly general enough that it would not induce a consumer to use it for a specific purpose; for example, it did not identify a specific result that will be achieved by using it.

In *People for the Ethical Treatment of Animals v. Whole Foods Mkt. Cal. Inc.*, No. 15-CV-04301 NC, 2016 WL 1642577 (N.D. Cal. Apr. 26, 2016), the court dismissed a false advertising claim against the language "Great-Tasting Meat From Healthy

Animals" as being nonactionable puffery. *Id.* at *3. The court reasoned that the statement, and similar ones, are "unspecific and unmeasurable," and therefore constituted puffery. *Id.* at *4. Defendant's advertising is no different. Whether a product is "great" for cooking or baking is not something that can be measured, and thus, similarly amounts to puffery.

Separately, Plaintiff identifies that a number of Smart Balance Original spreads were reported as rancid by consumers, possibly due to the increased water content and a substitution of flax oil in the product. (FAC ¶¶ 55, 138–51.) However, Plaintiff points broadly to general consumers as having suffered this injury, rather than pleading that she herself purchased a rancid spread. (*See id.* ¶¶ 139–51, 240–52 (using language such as "some consumers" and "numerous consumers").) She does not plead that she herself purchased a rancid spread until her filed Opposition (*See* ECF No. 54 at 11–12.) Plaintiff lacks standing to bring this claim because, based on the assertions in her Amended Complaint, she was not personally harmed by an allegedly rancid spread. *See E.&J. Gallo Winery v. Instituut Voor Landbouw-En Visserijonderzoek*, No. 1:17–CV–00808–DAD–EPG, 2018 WL 2463869, at *9 (E.D. Cal. June 1, 2018) (a plaintiff must plausibly allege how they suffered damages). And while Plaintiff does eventually claim that she herself purchased a rancid spread, it comes in her Opposition, rather than in her Amended Complaint as required. *See Smith v. City of Vallejo*, No. 2:07CV1707WBS KJN P, 2010 WL 2383606, at *5 (E.D. Cal. June, 2010) (an Opposition is not the proper vehicle for raising new factual allegations). Because the Court cannot consider new allegations raised in an Opposition, Plaintiff lacks standing to raise this particular theory based on the allegations in the operative complaint.

Accordingly, this claim is dismissed. However, the Court will grant leave to amend as to this claim.

////

////

**C.     Defendant's Use of Water in Lieu of Oil Did Not Constitute Economic Adulteration.**

Plaintiff argues that altering the Smart Balance Original spread's formula to contain more water and less oil amounted to economic adulteration of the product. (FAC ¶ 31).  This claim has already deemed nonviable by Judge England.  (ECF No. 39 at 5, n.3.)

Under the federal Food Drug and Cosmetic Act (FDCA) regulations, a food shall be deemed to be economically adulterated: (1) if any valuable constituent has been in whole or in part omitted or abstracted therefrom; or (2) if any substance has been substituted wholly or in part therefor; or (3) if damage or inferiority has been concealed in any manner; or (4) if any substance has been added thereto or mixed or packed therewith so as to increase its bulk or weight, or reduce its quality or strength, or make it appear better or of greater value than it is.  21 U.S.C. § 342(b)(1); *see* Cal. Health & Saf. Code § 110585 (incorporating a similar definition under state law).

Judge England dismissed this claim as improperly pled because Supreme Court precedent precludes accurately labeled products from being considered economically adulterated.   (ECF. No. 39 at 5 n.3;) *Fed. Sec. Adm'r v. Quaker Oats Co.*, 318 U.S. 218, 230 (1943) (it is not economic adulteration when the product a consumer is marketed is the product the consumer receives).  Plaintiff again brings this claim, but because the product she received was correctly labeled, her claim cannot be successful.  As before, this argument is rejected.

**D.     Smart Balance Original's Classification as a "Buttery Spread" Did Not Indicate a Flavor and Thus Did Not Require a Front-Label Disclosure That the Product Contains Artificial Flavors.**

Products that contain artificial flavors must disclose that fact somewhere on the packaging.  21 U.S.C. § 343(k); 21 C.F.R. 101.22(c).  If the product's characterizing flavor is derived from artificial ingredients, then the use of those ingredients must be disclosed on the product's principal label, although a consumer may be expected to

10

also consult a product's back label if the front label is not unambiguously deceptive. 21 C.F.R. 101.22(i)(2); *McGinity v. Procter & Gamble Co.*, 69 F.4th 1093, 1098 (9th Cir. 2023) ("However, the front label must be unambiguously deceptive for a defendant to be precluded from insisting that the back label be considered together with the front label.").

Plaintiff brings new allegations that the front label's classification of the product as a "buttery spread," and the product's use of artificial butter flavors, required that the product label also include a front-label disclosure that it contained those artificial flavors. (FAC ¶ 194.) Defendant argues that "buttery spread" is not an indication of flavor, but instead a "statement of identity" that describes the function and texture of the product. (Mot. at 17.) Additionally, Defendant points out that the product did contain a back-label disclosure that it contains artificial flavors. (*Id*.)

Defendant is correct. Regulations promulgated under the FDCA require "a statement of the identity of the commodity." 21 C.F.R. § 101.3. That "statement of identity" must be in terms of: (1) the name prescribed by federal law or regulation, "(2) [t]he common or usual name of the food; or, in the absence thereof, (3) [a]n appropriately descriptive term, or when the nature of the food is obvious, a fanciful name commonly used by the public for such food." 21. C.F.R. § 101.3(b); *see Ang v. Whitewave Foods Co.*, No. 13-CV-1953, 2013 WL 6492353, *3 (N.D. Cal. Dec. 10, 2013) (discussing statement of identity requirements). In alignment with those regulations, the U.S. Food and Drug Administration ("FDA") has deemed "buttery spread" a statement of identity – rather than an indication of flavor – and that its primary purpose is to describe the product's characteristics. *See* U.S. Food & Drug Admin., "Commercial Item Description Buttery Spreads" at 2 (Nov. 6, 2008) (describing buttery spread as "[a] soft spread made from liquid vegetable oils with 5 percent or less butter or butter flavor (natural and/or artificial), containing up to 5 g or less of saturated fat per tablespoon serving and no more than a trace amount of

1  cholesterol.")[1]; (*see also* Mot. at 15–16).

2  Further, while there is a dearth of caselaw that would inform whether "buttery
3  spread" would be a flavor or a product description, common sense weighs in favor of
4  finding that the Smart Balance Original spread's label was not unambiguously
5  deceptive.  The thrust of the *McGinity* and related regulations is that labels should
6  avoid misleading a consumer that a product does not contain artificial flavorings when
7  it actually does.  *See* 69 F.4th at 1098; *see also* 21 C.F.R. § 101.3.  But here the front
8  label's identification of the product as a "buttery spread" would not mislead
9  consumers into thinking that the product does not contain artificial flavors, which its
10 back label ingredient list clearly denotes.  Instead, it more concretely described the
11 texture of the product—that it is a soft spread *like* butter.  Accordingly, the Court finds
12 that the label is not in violation of statutory requirements that it disclose its artificial
13 ingredients on its front label.

14    **E.    Leave to Amend**

15 A court granting a motion to dismiss a claim must decide whether to grant
16 leave to amend.  Leave to amend should be "freely given" where there is no "undue
17 delay, bad faith or dilatory motive on the part of the movant, . . . undue prejudice to
18 the opposing party by virtue of allowance of the amendment, [or] futility of [the]
19 amendment . . . ."  *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Eminence Cap., LLC v.*
20 *Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) (listing the *Foman* factors as those to
21 be considered when deciding whether to grant leave to amend).  But, dismissal
22 without leave to amend may be proper if it is clear that "the complaint could not be
23 saved by any amendment."  *Intri-Plex Techs.*, *Inc. v. Crest Group, Inc.*, 499 F.3d 1048,
24 1056 (9th Cir. 2007) (citing *In re Daou Sys., Inc.*, 411 F.3d 1006, 1013 (9th Cir. 2005);
25 *Ascon Props., Inc. v. Mobil Oil Co.*, 866 F.2d 1149, 1160 (9th Cir. 1989) ("Leave need
26 not be granted where the amendment of the complaint . . . constitutes an exercise in

---

[1] https://www.ams.usda.gov/sites/default/files/media/CID%20Buttery%20Spreads.pdf, last visited Mar. 27, 2025.  While the document is from 2008, the FDA continues to list it as current on its website.

futility . . . .")).

Here, the Court finds that it is clear that the majority of the First Amended Complaint's defects cannot be saved by additional amendment. Plaintiff has failed to successfully amend her arguments originally dismissed in Judge England's Order, and the Court does not find that giving her an additional opportunity would yield a different result.  Her new claim – that "buttery spread" misleads a consumer as to the use of artificial flavoring in the product – cannot survive given the term's technical use as a statement of identity under FDA guidelines.

However, the Court will grant leave to amend for Plaintiff's claim regarding the allegedly rancid nature of some of the purchased products.  While Plaintiff does not allege in her FAC that she herself would have standing to bring the claim, she does so in her Opposition.  Because her FAC's deficiency regarding standing to bring this claim can be remedied, this specific claim will be dismissed with leave to amend.

## CONCLUSION

The majority of Plaintiff's claims were properly dismissed in the first instance by Judge England.  She does not provide sufficient new information or adequately viable claims in her amended complaint that would enable her complaint to move forward. Defendant's Motion to Dismiss is granted, and Plaintiff may amend and refile her complaint within 21 days as it pertains to her rancid product claim.  IT IS SO ORDERED.

IT IS SO ORDERED.

Dated:  **March 27, 2025**

Hon. Daniel J. Calabretta
UNITED STATES DISTRICT JUDGE

DJC5 – elliot23cv01417.MTD